IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL LEWIS | : | CIVIL ACTION |
| | : | NO. 13-3527 |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY | : | |
| HEALTH SYSTEM, et al. | : | |

O'NEILL, J.                                        March 26, 2015

## MEMORANDUM

Plaintiff, Carl Lewis, "a black Jamaican male, who was 58 years old at the time of his separation from" defendant Temple University Health System, Dkt. No. 33-1 at ¶ 1, asserts claims against Temple and defendant Joseph Moleski for race discrimination and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981, race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., wrongful termination discrimination and retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., and race and age discrimination and retaliation under the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, et seq.  Now before me is defendants' motion for summary judgment (Dkt. No. 32), plaintiff's response and counterstatement of material and disputed facts (Dkt. No. 33), and defendants' reply (Dkt. No. 34).  For the reasons that follow, I will grant defendants' motion.

## BACKGROUND

Plaintiff began work at Temple in the role of executive chef/kitchen manager in August 2005, Dkt. No. 33-5, and in 2007, he became executive chef/kitchen manager/food purchasing manager.  Lewis Dep. 82:2-13.  Plaintiff contends that he had been performing the function of "purchasing manager" "from the beginning of his employment and thereafter."  Dkt. No. 33-1 at

¶ 10.  In his June 2010 annual performance evaluation, plaintiff received a score of 2.27 out of 3.0 for a rating of "performance consistently meets standards."  Dkt. No. 33-8.  In his June 2011 performance evaluation, plaintiff received a score of 2.15 out of 3.0, again receiving a rating of "performance consistently meets standards."  Dkt. No. 33-9.  Plaintiff testified that he received annual salary increases while employed at Temple.  Lewis Dep. at 87:1-3.

In June 2011, Moleski was hired as the director of Temple's hospitality and nutrition services.  Moleski Dep. at 10:23-11:24.  Plaintiff then directly reported to Moleski.  Id. at 13:16-14:6.  Moleski testified that when he began working at Temple, "in the beginning, we just started out and there was a lot of resistance to trying to get the department to run according to, you know, healthcare regulations and efficiency standards, and there was a lot of pushback from Mr. Lewis, a lot of resistance."  Moleski Dep. at 57:11-18.  Plaintiff testified that

> Moleski, from the very first day that he joined Temple, he has displayed a very hostile behavior towards me, continue to call me in his office, let me know that he preferred to hire young college kids from universities because they are more smarter and more educated.  And he continue to escalate his aggressive behavior to me every opportunity that he gets. . . .

Lewis Dep. at 148:8-16.  Plaintiff also testified that Moleski "just displayed a very aggressive behavior towards me.  Very strong, very, very assertive, which is not the normal tone of a new manager or a department head coming on board.  And . . . at no time have seen him display that to the other managers."  Id. at 106:14-19.

Plaintiff testified that, shortly after Moleski arrived at Temple, plaintiff verbally reported Moleski's "aggressive behavior" to Lasherrial Mallet, who was a labor relations specialist at Temple at the time of the events at issue.  Lewis Dep. at 167:16-168:1; Mallett Dep. at 9:18-10:8.  Plaintiff testified that Mallett "explained to [him] that [he] need[ed] to put it in writing."  Lewis Dep. at 166:24-167:3.  Plaintiff also testified that when he spoke to Mallett he "explained

to her the situation about the hiring of the young people and the verbiage that he was using towards my age.  Towards my age.  And how they were – offensive they were, and she agreed that she was going to have a verbal conversation with [Moleski]."  Id. at 174:17-24.  Mallett, however, testified that she "did not meet with [plaintiff] until after he filed a [written] complaint, that was the first time I met with him regarding his complaint."  Mallett Dep. at 56:10-13.

Instead, Mallett, testified that within a month of Moleski's arrival at Temple it was Moleski who came to her "complaining about Mr. Lewis being very combative when presented with tasks to do.  Tasks such as putting together the inventory system or feeling like Joe should not have been questioning some of his methods."  Id. at 33:19-23.  To that end, in July 2011, soon after his arrival at Temple, Moleski emailed plaintiff regarding excess milk inventory, explaining "[w]e cannot afford to have perishable stock on hand aging that we do not need." Dkt. No. 32-1 at ECF p. 62.  On August 5, 2011, Moleski emailed Lewis asking him to "discontinue the practice of ordering in fresh fish too early" and to "ensure the quantity ordered is in alignment with our actual sales to reduce waste."  Id. at ECF p. 66.  On August 9, 2011 Moleski sent plaintiff another email in which he explained to plaintiff that out of the 107 portions of fish that plaintiff had ordered and prepared, only 29 servings had been sold.  Id. at ECF p. 67.

In an August 5, 2011 email, plaintiff responded to Moleski's initial email about the fish order saying, "[t]oday you reprimand[ed] me openly at our department meeting about the fish, in the presence of other staff members and kitchen supervisors.  I was very embarrassed and felt belittled and disrespected by you."  Id. at ECF p. 66.  Plaintiff went on to complain that

> [o]ver the past 8 weeks you have demonstrated a lot of hostility
> towards me[.]  I am not sure as I never had a relationship with
> [you] prior to you working here, even though I have tried very hard
> to accomplish[ ] almost every assignment[ ] and direction[ ] that
> you have given me[.]

<u>Id.</u>

On August 17, 2011, Moleski sent an email to his supervisor Dale Schlegel, a vice president at Temple, expressing his concern that plaintiff "flew off the handle yesterday when I told him there were three pallets of paper in the hallway near the main hospital storeroom that needed to be removed immediately . . . ."  <u>Id.</u> at ECF p. 73.  Moleski wrote that plaintiff "became very angry, loud and defiant to me.  I persisted in my request and he had them removed but with too much drama, pushback and excuses."  <u>Id.</u>  Moleski explained that he had discussed plaintiff's "inappropriate behavior with HR" and wrote that they "would be developing a corrective action plan to address this conduct and other performance issues."  <u>Id.</u>  One week later, on August 22, 2011, Moleski emailed plaintiff asking "[h]ow did we have 5 cases of choc[olate] milk expire that had be thrown out as waste?  Over ordering is my guess.  Do you have another explanation?"  <u>Id.</u> at ECF p. 75.

Plaintiff testified that two to three months after Moleski's arrival, plaintiff had a conversation with Schlegel, during Schlegel's normal Wednesday "morning walk" through the kitchen, where plaintiff "told him I was not happy about the treatment that I was receiving from Joe Moleski.  And . . . he said to me, if there is an issue, I need to send a report to HR."  Lewis Dep. at 121:9-124:9.  On September 14, 2011, plaintiff filed a formal harassment complaint form with Temple's human resources department.  Dkt. No. 32-1 at ECF p. 77.  In his "detailed account of the incident," plaintiff wrote:

> Un job strain [sic], not having the right tool[s] to do my job[,] daily harassment, undue stress which is affecting [sic] my health[.]  Not recognizing my position as a department head, daily treat of my job [sic].  Expected to accomplish a large amount of work in a short amount of time with no control over how and when with what tools said work will get done.  I have been performing job well prior to my new boss com[ing] on board[.]  Insulting me in the presen[ce] of others, racial profiling, soliciting information

-4-

from subordinates on my performance.

Id.[1]  Mallett received plaintiff's written complaint and scheduled a meeting with him.  Mallett

Dep. at 56:14-57:7.  She testified that when she met with plaintiff about his discrimination

complaint, plaintiff was:

> [b]asically saying that he didn't have the tools to do his job, he felt
> like [Moleski] wasn't being clear about what he wanted in terms of
> the inventory system, which was a recurring theme in a lot of the
> conversations that I had with [Moleski].
>
> He said that he felt like [Moleski] was soliciting information, he
> did say that from his subordinates about who was doing the
> ordering and why was so much food being ordered at one time.
>
> Then at the end of the conversation he felt like he was being
> racially targeted I think is what he used.  He didn't say racial
> profiling, I think he said he was being targeted.  That is the sum of
> it.  I don't recall like detailed, but I know that was the sum of the
> conversation.

Mallet Dep. at 61:14-62:7.

Mallett explained that when she asked for an explanation of plaintiff's complaint he "said

that he feels [Moleski] was trying to get rid of all the black people in the department."  Id. at

63:11-13.  She asked plaintiff "why he felt that way, and he said [Moleski] wants to bring in his

own people and he wasn't able to articulate why he felt that way because at the time no one had

been terminated."  Id. at 63:16-20.  Mallet testified that she felt that plaintiff's complaint of race

discrimination was untruthful because she "asked him to explain or give me reasons why he

thought that and he said because all the black managers are being fired, and I said there have

been no black managers that have been fired so I need you to elaborate and he did not."  Id. at

81:19-82:6.  At plaintiff's deposition, when asked whether he had told Mallett "that [he] felt as

though [ ] Moleski wanted to get rid of all the black managers and wanted an all-white

---

[1]        There is no mention of age discrimination in plaintiff's harassment complaint.

department" he responded "[a]bsolutely not" and that he had not made such a statement at any

time during his employment at Temple.  Lewis Dep. at 262:7-20.

Mallet testified that after her meeting with plaintiff she "talked to [Moleski's]

subordinates who are all African American and in some way, shape or form have, not necessarily

reporting relationship, but they work with [Moleski], asked them if they ever experienced any

feelings of racial discrimination and they said no."  Mallett Dep. at 64:17-23.  Among the

employees with whom she spoke was Porter, who according to Mallett's testimony, she asked "if

he ever felt like [Moleski] was treating him unfairly or did he have any reason to think that he

was being racially discriminated against, and he said no."  Id. at 65:3-66:4.  Mallett also testified

that she spoke with Dwayne Wyatt, another Temple employee, also black, who "said that he

never experienced any racial discriminatory feelings."  Id. at 67:-22.  Mallett testified that when

she spoke to Moleski about plaintiff's complaint

> [o]f course he denied [ ] discriminating against him.  He felt like he
> just wanted him to get the work done.  He just wanted Chef to put
> the inventory system in place, he wanted him to stop over ordering
> things.  That is all it was about for him.  And Chef to not be so
> combative.

Id. at 69:15-22.  Following her investigation of plaintiff's complaint, she "was not able to

substantiate his claims of discrimination based on his race."  Id. at 72:19-21.

Moleski testified that Mallett never told him about plaintiff's formal harassment

complaint and that the first time that he learned of the complaint was when plaintiff filed this

lawsuit.  Moleski Dep. at 89:6-13; see also id. at 90:23-91:3 ("[A]fter [plaintiff] went on a

corrective action plan, I guess he went to [Mallett] and she wanted to talk to me about it, but I

didn't know about any formal complaint or anything like that.").  Mallett, however testified that

she met with Moleski and "told him that the complaint was filed and told him what the nature of

the complaint was." Mallett Dep. at 64:24-65:2. She conveyed to him that she

> received a complaint, I already spoke[ ] to [plaintiff] about his
> complaint, and basically he is saying that you are discriminating
> against him, that he does not have the tools to do his job, feels like
> you are not clear about what you want as far as the job is
> concerned, and that was basically it.

Id. at 69:7-14. Mallett then testified that

> Of course [Moleski] denied the discriminating against [plaintiff].
> He felt like he just wanted [plaintiff] to get the work done. He just
> wanted [plaintiff] to put the inventory system in place, he wanted
> him to stop over ordering things. That is all it was about for him.
> And [plaintiff] to not be so combative.

Id. at 69:16-22.

On October 10, 2011, just under a month after plaintiff filed his harassment complaint

with human resources but well after Moleski's email to Schlegel discussing the development of a

corrective action plan to address plaintiff's performance issues, Moleski provided plaintiff with a

Performance Improvement Plan (PIP) in the form of a memorandum outlining concerns about

plaintiff's performance. Dkt. No. 32-1 at ECF p. 89-90. Specifically, the memorandum

identified concerns regarding plaintiff's "Interpersonal Skills, Leadership Defensiveness,

Cooperation," "Accurate Information," "Over Ordering Supplies/Over Production/Ordering

System," "Sanitation/Safety/Survey Readiness," and "Attendance Policy Enforcement." Id. at

ECF p. 89. The memorandum identified corrective actions that plaintiff was to take within

ninety days with respect to each of the identified concerns and explained that "[i]f you cannot

correct your behavioral deficiencies and meet my expectations, your employment may be

terminated." Id. at ECF p. 89-90. Plaintiff refused to sign the memorandum. Id. at ECF p. 90.

Stacey Vahey, who was Temple's associate hospital director for human resources at the time of

the events at issue, Vahey Dep. at 8:2-3, testified that "the performance improvement plan came

after there had already been coaching conversations and coaching around performance.  Because

things weren't changing and the performance was still declining, that's when the

recommendation was to put him on the performance improvement plan to make it more formal

because he had not been performing."  Id. at 28:8-16.

On November 28, 2011, Moleski emailed Mallett "to update [her] on some serious

concerns with Carl Lewis' job performance in light of his current corrective action plan."  Dkt.

No. 32-1 at ECF p. 115.  Moleski explained that plaintiff

> continues to have difficulties on ordering supplies correctly,
> especially on weekends and holidays.  He had a huge . . . US Foods
> order arrive today for over $12,000 but we were packed with food
> from his previous orders before the holiday.  He is not able to
> accurately forecast correct amounts of food required.  This over
> ordering leads to clutter, waste and improper storage of supplies.

Id.

Plaintiff testified that "somewhere around in December," at the end of 90 days, he had

completed some of the tasks in the PIP "a hundred percent, and [Moleski] was . . . very satisfied

with the extensive progress that I've made" but conceded that there were

> ones that he considered still to be things that he need me to work
> on.  For . . . instance . . . his main concern was that purchasing
> manual and a purchasing guide.  I – he asked me for the first one,
> which was one in Excel.  I gave that one to him.  Then he said he
> did not like that one, he wanted me to do manually, which I did.
> Then he said he did not like that one, he wanted to have one in C
> board, and I gave that to him.  Then I revert back to the whole plan
> that I have in U.S. food service system that I was always working
> and prior to Mr. Moleski coming on board.

Lewis Dep. at 240:11-241:9, 243:20.

On May 7, 2012, Moleski prepared another memorandum to plaintiff regarding

"[o]ngoing performance deficiencies."  Dkt. No. 32-1 at ECF p. 92.  The memorandum

explained that plaintiff "was placed on a formal Performance Improvement Plan in October 2011

during which [he] demonstrated improvement in some areas," but expressed concern that Moleski had "not observed the level of improvement in [plaintiff's] performance to be successful in [his] position." Id.  The memorandum identified concerns  regarding "[i]naccurate ordering of products and supplies," "[f]ailure to implement an effective inventory system for ordering supplies," "[a]bility to provide accurate information," "[l]ack of accountability," and "[a]bility to actively listen and receive constructive feedback." Id.  Moleski explained, "[s]pecifically, I have provided multiple extensions to complete the inventory project and to date limited effort has been made to do so." Id.  The memorandum explained that "over the next 30 days it is required that your performance in the areas listed above be brought up to standard or your employment will be terminated." Id.  Lewis refused to sign the memorandum. Id.  He testified that he refused to sign because "[t]he deck was stacked on me . . . .  In other words, all – all the supportive staff was taken away from me but I was still charged to complete the task without the necessary tools to complete the job."  Lewis Dep. at 250:20-251:3.

Mallett testified that when Moleski asked to have plaintiff placed on a second PIP she believed that the second PIP was not appropriate and that she recommended that plaintiff be terminated.  Mallett Dep. at 40:11-41:17.  Mallett testified that she said to Moleski that

> if [plaintiff] is not meeting the requirements of the PIP you need to decide whether this is a person that you want to keep on your team or not.
>
> And he decided he wanted to extend.  I said I don't think that is a good idea because if he is continuing to do the same behavior there is no reason to keep him around.

Id. at 41:3-10.

For the year ending in June 2012, plaintiff received a score of 2.10 or "Performance consistently meets standard" on his performance evaluation.  Dkt. No. 33-18 at ECF p. 3.

Plaintiff's performance was rated as deficient with respect to:  "Responds appropriately to situation.  (Inappropriate reaction to constructive criticism)."  Id. at ECF p. 4.  Under "supportive documentation and comments" it was noted that plaintiff had been placed on "two Corrective Action Plans" during the year "to address serious issues with over ordering supplies, developing an inventory system by storage location and bin number, providing accurate information, and responding appropriately to constructive criticism."  Id. at ECF p. 15.  The comments also explained that plaintiff "still needs to improve in the following areas:  Ensure employees are consistently held accountable for attendance and employee health commitments using TUH Standards and Corrective Action procedures."  Id.

On July 19, 2012, Moleski and another Temple employee conducted a safety and sanitation inspection of plaintiff's department.  Lewis Dep. at 265:7-266:3.  On July 20, Moleski emailed plaintiff with a list of numerous specific items found during the inspection that required attention "by July 27, 2012" including items described as "filthy," "greasy," or "broken.  Dkt. No. 32-1 at ECF p. 94-97.  Plaintiff testified that "this inspection was one-sided.  It was not given to the cafeteria manager.  Only my area was inspected, and it was supposed to be a complete inspection walk-through of the entire department."  Lewis Dep. at 268:22-269:2.  Asked if he disagreed with the information in the inspection report, plaintiff testified "in my area, it was – I agree that the kitchen floors possible was not clean because wanted inspections during the bus period [sic].  But as far as the condition of the walk-in boxes and all, those were in good shape."  Id. at 268:17-21.

Plaintiff was "terminated effective August 3, 2012 for failure to meet performance standards."  Dkt. No. 32-1 at ECF p. 99.  The termination letter written by Moleski explained that

> [i]n October 2011 and May 2012 you were placed on a Performance
> Improvement Plan and were notified that failure to achieve and sustain
> performance expectations may result in termination.  You have not
> maintained an acceptable level of performance evidenced by continued
> issues with sanitation, purchasing and inventory.  Most recently your
> performance deficiencies were highlighted during a routine inspection on
> July 19, 2012 where the food production area was found in such an
> unacceptable condition that the hospital would be at risk of not meeting
> regulatory requirements.

Id.  Plaintiff testified that when he was terminated Moleski told him that "in the past we have

issue with – with plans and – and, you know, I've talked about these things and talk[ed] about

these things, and I've come to a conclusion that you are not fit for us.  We do not need you.  We

do not need your service anymore."  Lewis Dep. at 257:12-18.

Following his termination, "the majority of Plaintiff's duties were initially taken over by

Dwayne Wyatt, Food Production Supervisor, who is a 49-year-old, black male."  Dkt. No. 33-4

at ECF p. 8.  Over a year after plaintiff's termination, his replacement "Jeffrey Klova was hired

effective August 26, 2013.  Mr. Klova is a 53-year-old white male."  Id.

Plaintiff filed this action on June 20, 2013 (before Klova was hired).  In his amended

complaint, plaintiff claims that defendants discriminated against him based on his race.  Dkt. No.

24.  Asked to specifically describe the ways that Moleski discriminated against him based on his

race, plaintiff testified that:

> [r]egardless of what the concern or issue was between he . . . or
> any of my white counterpart, if there was something wrong with
> their department, he'd address them very politely with a great
> smile on his face, and he would talk to them in a very professional
> manner.  However, when he addresses me, he would address me in
> a very derogatory manner and would not – they could – give him
> feedback and react[ ] back to him, and you know, he'd give them
> his feedback and walk away.  I don't know what happened once
> they go behind close[d] door.  But the same – when he – when the
> same case come up towards me, if I responded back, then the
> escalation of reprimand would continue to become stronger.

Lewis Dep. at 182:22-183:15.  Plaintiff further complained that Moleski

> would always come into the department and would stand up, and
> he jokes with them and talk with them and sit and have lunch
> together.  But not with me unless there's an employee event where
> we sitting all in the same room and we sit at a table.  Or I take
> myself and place myself over there and sit with them. . . . And if
> I'm coming and they're talking, once I approach the table, they
> would stop talking.

Id. at 183:17-184:4.  Asked why he believed those interactions were a result of his race, plaintiff

testified

> [b]ecause . . . from the very first day that Joe Moleski came on
> board, he – without even knowing anything about me or anything,
> he came with a mission and he attacked me and that has not
> ceased.  They continue to escalate, and then when I filed a
> complaint there was a strong retaliation come against me and
> escalation of his behavior against me.

Id. at 184:4.14-185:3.

When Moleski was asked whether plaintiff "ma[de] any accusations against [Moleski] at

any point while [plaintiff] worked under [Moleski] that [would suggest that plaintiff] thought

that [Moleski] was singling [plaintiff] out because of his race or because of his age," Moleski

replied that toward the end of plaintiff's employment, "[t]here was only one time that he said that

you treat me like a colonial and I didn't really know what he meant by that."  Moleski Dep. at

143:5-17.  Ron Porter, who was  the food production supervisor at the time in question, Porter

Dep. at 8:1-5, and who is also black,[2] Mallett Dep. at 65:8-9, testified that he had never heard

plaintiff use the term "colonial."  Porter Dep. at 21:20-22:4.  Regardless, Porter testified that he

believed that plaintiff "thought" the tension in his relationship with Moleski "rooted from a racial

---

[2]     Although plaintiff cites Moleski's interactions with other employees as support
for his claim that Moleski discriminated against him based on his race, plaintiff also testified that
"every day Ron [Porter] was in [Moleski's] office talking about movies and basketball games
and they were having a wonderful time."  Lewis Dep. at 137:18-21.

thing." Porter Dep. at 21:11-15.  Pressed to explain his belief, Porter explained that plaintiff

"didn't feel as though he was being treated fairly from the other managers."  Id. at 21:16-19.

Porter also testified that "Moleski and Mr. Lewis just didn't communicate well.  So [Moleski's]

expectations for what he thought an Executive Chef should be in his facility, Mr. Lewis wasn't

really doing those things and I know [Moleski] was frustrated with that."  Id. at 33:21-34:1.

Although plaintiff never registered a formal complaint of age discrimination with

Temple's human resources staff, in his amended complaint he asserts that defendants

discriminated against him on the basis of his age in addition to his race.  Dkt. No. 24.  Plaintiff

testified that

> I felt discriminated by my age when Joe consistently let[ ] me
> know that his interest and his desire was to hire young college kids
> because they're smarter, they're more intelligent.  I also believe
> that my age was evident in the way he treated me, comparing to
> how he treat my younger coworkers.  I believe when we were at
> the meetings when he told me that they were smart and intelligent
> and he trust them but he considered me to be a liar.

Lewis Dep. at 176:20-177:6.  He also testified that at

> weekly department meetings, the younger staff, they could express
> any concern they have, issue or concern within the department.
> Everything would be fine as long as I listen and I don't open my
> mouth.  But if I open my mouth and say something about a
> department issue, whether it was related to sanitation, trying to get
> the department to work together as a team, shift coverage or
> anything like that, as soon – if I was not reprimanded and said to
> move on to the next person there or – or in other words, why –
> what do you have to say or [one of the younger staff members],
> what do you have to say while I was talking, I will be called in his
> office and I was chastised by him.  And I was told at those
> meetings, he don't expect any coming from me.  I should just come
> to those meetings and listen to feedback.

Id. at 179:8-180:3.  Asked to explain why he believed this treatment was because of his age,

plaintiff testified, "[b]ecause of this constant – every conversation, just about every opportunity

we have in conversation, [Moleski was] constantly expressing his desire to obtain young college kids." Id. at 180:19-181:2. Ron Porter testified similarly that "once a week" Moleski would say "that he thought that [younger employees] would give a fresher insight and just that they would boost new – I don't want to say energy, but just that they would have a different way of looking at things." Porter Dep. at 27:17-28:2. Plaintiff never told Porter that he found Moleski's comments about younger employees to be offensive. Id. at 28:9-12.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:
>
> > (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

-14-

produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

### I.    Direct Evidence:  Age Discrimination

Plaintiff contends that he has set forth direct evidence of age discrimination through his testimony that in "just about every opportunity we have in conversation, [Moleski] constantly expressing his desire to obtain young college kids [sic]," Moleski Dep. at 180:23-181:2; see also id. at 148:11-14 (testifying that Moleski "continue[d] to call me in his office, let me know that he preferred to hire young college kids from universities because they are more smarter and more educated [sic]"); 176:20-24 (testifying that he "felt discriminated by my age when Joe consistently let[ ] me know that his interest and his desire was to hire young college kids because they're smarter, they're more intelligent"), and through Ron Porter's testimony that Moleski would make comments about wanting to hire younger employees "once a week."  Porter Dep. at 27:17-28:2.  Defendants contend that plaintiff has not set forth direct evidence of discrimination. Dkt. No. 34 at ECF p. 2 n.1.  I agree with defendants.

In an age discrimination case, direct evidence must demonstrate that the decision would not have occurred without improper consideration of age.  See Gross v. FBL Fin. Servs., Inc.,

557 U.S. 167, 177 (2009).  To survive summary judgment, plaintiff must submit evidence from which a factfinder could reasonably conclude that age was the "but-for" cause of the employer's adverse employment action.  Id. at 177–78.  "Direct evidence may take the form of a workplace policy that is discriminatory on its face, or statements by decision makers that reflect the alleged animus and bear squarely on the adverse employment decision."  Garcia v. Newtown Twp., 483 F. App'x 697, 704 (3d Cir. 2012).  Direct evidence does not include stray remarks that are made in a context unrelated to the employment decision.  See Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir. 1994), citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992).

In support of his claim that Moleski's statements constitute direct evidence of discrimination plaintiff cites Fakete v. Aetna, Inc., 308 F.3d 335 (3d Cir. 2002).  See Dkt. No. 33 at ECF p. 8-9.  In Fakete, the District Court had found that a defendant's statement that Fakete "wouldn't be happy [at Aetna] in the future" because the defendant was "looking for younger single people" was insufficient to constitute direct evidence of age discrimination.  308 F.3d at 339.  The Court of Appeals reversed, finding that "a reasonable jury could find that Larkin's statement was a clear, direct warning to Fakete that he was too old to work for Larkin, and that he would be fired soon if he did not leave Aetna on his own initiative."  Id.  Importantly, "Larkin made his statement in direct response to a question from Fakete about how he fit into Larkin's plans."  Id.  The Court of Appeals held that "statements of a person involved in the decisionmaking process" could provide direct evidence of discrimination, if that evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it when he made the challenged employment decision."  Id.

Here, unlike in Fakete, there is no record evidence that connects Moleski's remarks

regarding his desire to hire younger workers to plaintiff's termination or the claimed retaliatory actions. Although Moleski's comments regarding his preference for hiring younger employees "bespeak a certain insensitivity, and provide circumstantial evidence of discrimination, there is no apparent connection between the alleged remarks and the alleged adverse employment actions." Byrd v. City of Phila., No. 12-4520, 2014 WL 5780825, at *5 (E.D. Pa. Nov. 6, 2014). Plaintiff has not set forth any evidence to support a conclusion that Moleski's comments "bear squarely on the adverse employment decision." Garcia, 483 F. App'x at 704. Direct evidence of discrimination establishes, without inference or presumption, that an employment decision was made for a discriminatory reason. Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). I cannot presume from Moleski's comments alone that plaintiff was fired because of his age. Cf. Hook v. Ernst & Young, 28 F.3d 366, 375 (3d Cir. 1994) (finding remarks were not direct evidence "[a]lthough they were made by a decisionmaker" where "[t]hey were temporally remote and they had nothing to do with [the plaintiff's] job performance").

## II.    Indirect Evidence:  Prima Facie Case

Absent direct evidence of discrimination based on his age or race or direct evidence of retaliation, plaintiff may satisfy his burden on summary judgment by presenting indirect evidence of discrimination and retaliation sufficient to satisfy the three-step framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Burton v. Teleflex Inc., 707 F.3d 417, 425-26 (3d Cir. 2013) (ADEA and Title VII); Shahin v. Delaware, 531 F. App'x 197, 199 (3d Cir. 2013) (applying McDonnell Douglas burden-shifting to discrimination and retaliation claims under Title VII); Brown v. J. Kaz, Inc., 581 F.3d 175, 181–82 (3d Cir. 2009) ("[T]he elements of a § 1981 claim are identical to the elements of a Title VII employment discrimination claim."); Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) ("retaliation claims

-17-

under both the ADEA and the PHRA typically proceed under the McDonnell Douglas framework").[3]

**A.      Age Discrimination (ADEA and PHRA)**

First, I find that plaintiff has set forth a prima facie case of age discrimination.  To do so, plaintiff must show that he: 1) is 40 years of age or older; 2) was subjected to an adverse employment action; 3) was qualified for his position; and 4) was treated less favorably than a sufficiently younger person under circumstances giving rise to an inference of age discrimination.  See Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009); Torre v. Casio, Inc., 42 F.3d 825, 831 (3d Cir. 1994); Willis v. UPMC Children's Hosp. of Pittsburgh, No. 13-131, 2015 WL 539995, at *4 (W.D. Pa. Feb. 10, 2015) ("Replacement by a younger person is not always required.").  Plaintiff has shown and defendants concede that he is over forty years old and that he was terminated.  See Dkt. No. 32 at ECF p. 14.

Defendants contend that plaintiff has not shown that that he was qualified for the position he held at Temple "because he was a subpar employee who was warned, counseled, and disciplined for identified performance issues."  Id.  However, "[d]efendant[s]' argument that Plaintiff was unqualified is best construed as a legitimate, non-discriminatory reason for [Temple's] employment decision rather than as a barrier to Plaintiff's prima facie case."  Wooler v. Citizens Bank, No. 06-1439, 2006 WL 3484375, at *2 n.3 (E.D. Pa. Nov. 30, 2006).  The proper inquiry for purposes of plaintiff's prima facie case is whether plaintiff was objectively qualified for the position of executive chef/kitchen manager/food purchasing manager.  Sempier

---

[3]      To the extent that plaintiff asserts claims for age and race discrimination and retaliation under the PHRA, I note that "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).  Neither side argues that the PHRA should be interpreted any differently from federal law in this case.

v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (citation omitted) ("we determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard"); see also Ezold, 983 F.2d at 523 (observing that, in "cases involving a dispute over 'subjective' qualifications . . . the qualification issue should often be resolved in the second and third stages of the McDonnell Douglas/Burdine analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case"); Gonzalez v. Passaic Cnty. Prob., No. 04-3001, 2005 WL 2077294, at *4 n.5 (D.N.J. Aug. 25, 2005) ("[T]he 'qualified' prong of the prima facie case is more of a screening mechanism i.e., to weed out clear cut cases such as jobs requiring certain levels of educational degrees, licenses, etc., and any on the job performance evaluations are more appropriately considered in the pretext phase of the case.").  Plaintiff has set forth evidence that he received evaluations of "[p]erformance consistently meets standard" in 2010, 2011 and 2012. Dkt. Nos. 33-8, 33-9 and 338-18 at ECF p. 3.  He served as Temple's executive chef/kitchen manager/food purchasing manager for five years and was employed by Temple for almost seven years.  Dkt. No. 33-5; Lewis Dep. 82:2-13.  This evidence is sufficient to show that plaintiff was qualified for his position for purposes of his prima facie case.

      In support of the final element of his prima facie case, plaintiff asserts that he "was 58 when he was terminated, and he was initially replaced by a 48 year old employee . . . for a brief period of time, before he was ultimately replaced by a 52 year old employee."  Dkt. No. 33 at ECF p. 13.  Although both of plaintiff's replacements are over forty years old, "[a] plaintiff under the ADEA need not show that the successful candidate was someone who was not in the protected class, i.e. below age 40.  All that need be shown is that the beneficiary of the alleged discrimination is 'sufficiently younger' to permit an inference of age discrimination."  Barber v. CSX Distrib. Servs., 68 F.3d 694, 699 (3d Cir. 1995).  In view of the evidence regarding the

younger age of plaintiff's replacements, combined with plaintiff and Porter's testimony about
Moleski's comments that he wanted to hire younger employees, I find that plaintiff has met his
burden to establish the fourth element of a prima facie case of age discrimination.  See Sweeney
v. Roche Diagnostics Corp., No. 11-1691, 2013 WL 6731049, at *10 (M.D. Pa. Dec. 19, 2013)
(finding the plaintiff met his burden on the fourth prong of his prima facie case of discrimination
where he produced evidence that the defendant "made a number of disparaging remarks
indicating a predilection for age and race discrimination"); Tozzi v. Union R. Co., 722 F. Supp.
1236, 1240 (W.D. Pa. 1989) ("We look not only to the actual age difference, but to the
surrounding circumstances to determine if Plaintiff has raised an inference of discrimination.").

### B.    Race Discrimination (Title VII, Section 1981 and PHRA)

To establish a prima facie case of race discrimination, plaintiff must show:  1) that he is a
member of a protected class; 2) he was qualified for the position he held; 3) he suffered an
adverse employment action; and 4) that the adverse employment action occurred under
circumstances that give rise to an inference of discrimination.  McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802 (1973).  Although plaintiff is "a black Jamaican male," Dkt. No. 33-1
at ¶ 1, and, as is set forth above, he has set forth sufficient evidence of his qualifications for his
position, I find that he has not set forth evidence sufficient to establish the fourth element of his
prima facie case of race discrimination.

Plaintiff asserts that he "can raise an inference of discrimination if he can show that he
was replaced by someone outside of his protected class."  Dkt. No. 33 at ECF p. 35.  He argues
that he has established the fourth element of a prima facie case of race discrimination because he
"was replaced by . . . Jeffrey Klova (Caucasian), hired effective August 26, 2013."  Id.  But
while it is true that plaintiff was ultimately replaced by Klova, a Caucasian, for the year

-20-

following his termination Wyatt, who is also black, undertook the majority plaintiff's duties. Dkt. No. 33-4 at ECF p. 8. Given the lack of temporal proximity between plaintiff's termination and the hiring of his Caucasian replacement and that plaintiff's duties were performed by another black employee following his termination, I find that the hiring of Klova, without more, is insufficient to support a finding that plaintiff's termination occurred under circumstances that give rise to an inference of discrimination.

Plaintiff endeavors to provide further support for a finding that his termination gives rise to an inference of discrimination in his counter statement of material and disputed facts. There, plaintiff explains that "he genuinely believed that Moleski harbored a discriminatory animus against him based on his race . . . , because whenever Moleski addressed his white-counter parts [sic], . . . or other white managers, he was polite, friendly and professional; however whenever he addressed Lewis, he would address him in a derogatory and cutting manner." Dkt. No. 33-1 at ¶ 34. He also notes that "Porter admitted that Lewis had confided in him that he felt there might be some kind of a racial animus by Moleski towards him based on the way he was treated in comparison to the other [Caucasian] managers." Id. at ¶ 35 (alteration in original). However, "[s]imply because Plaintiff says he was discriminated against, however, does not make it so." Hicks v. Tech Indus., 512 F. Supp. 2d 338, 348 (W.D. Pa. 2007). "An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action." Howard v. Blalock Elec. Serv., Inc., 742 F. Supp. 2d 681, 702 (W.D. Pa. 2010); see also Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992) ("Conclusory allegations of generalized racial bias do not establish discriminatory intent."). "That Plaintiff feels [he] was treated poorly is insufficient to establish the presence of the discriminatory animus required for liability" to attach. Sencherey v. Stout

-21-

Rd. Assocs., Inc., No. 09-2856, 2011 WL 499981, at *8 (E.D. Pa. Feb. 11, 2011). Accordingly, I will grant defendants' motion for summary judgment with respect to plaintiff's race discrimination claims.

### C.     Retaliation (Title VII, Section 1981, ADEA and PHRA)

To establish a prima facie claim of unlawful retaliation, must show that: (1) he engaged in a protected activity; (2) the defendants took an adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action taken. See Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996) (citations omitted). I find that plaintiff has met his burden to establish a prima facie case of retaliation.

Plaintiff has shown that he engaged in a protected activity. "Protected activity" includes both making formal charges of discrimination against an employer as well as lodging informal protests of discriminatory employment practices—including taking those complaints to management. See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006). Plaintiff contends and defendants concede that plaintiff engaged in a protected activity when he filed his formal September 14, 2011 harassment complaint with Temple's human resources department. Dkt. No. 33 at ECF p. 18; Dkt. No. 32 at ECF p. 23. Plaintiff also contends that he engaged in protected activity when he "made a verbal complaint to LaSherrial Mallet . . . approximately two (2) or three (3) weeks after Moleski started wherein he discussed Moleski's aggressive manner and interactions towards him" including Moleski's age related comments.[4] Dkt. No. 33 at ECF p. 20, when he approached Dale Schlegel, and when he

---

[4]        Mallet recalled, however, that she did not have a conversation with plaintiff until

addressed his concerns about Moleski with Moleski and Vahey.  Id. at ECF p. 21.  Drawing all

inferences in Plaintiff's favor, I find that his informal complaints constitute protected activities

only to the extent that they implicated claims of age or race discrimination.  Any general

complaints by plaintiff not specifically addressing plaintiff's race or his age, such as complaints

regarding Moleski's "aggressive manner and interactions toward him," Dkt. No. 33 at ECF p. 20,

are not sufficient to constitute protected activity.  See Daniels v. Sch. Dist. of Phila., 776 F.3d

181, 193 (3d Cir. 2015) ("The complaint must allege that the opposition was to discrimination

based on a protected category, such as age or race."); Barber v. CSX Distribution Servs., 68 F.3d

694, 701-02 (3d Cir. 1995) (holding that a letter to an employer's Human Resources Department

was not protected activity because it did not specifically complain about age discrimination).  "A

general complaint of unfair treatment does not translate into a charge of illegal . . .

discrimination."  Barber, 68 F.3d at 702.

　　　　"[T]o satisfy the second prong of a prima facie case of retaliation, the plaintiff 'must

show that a reasonable employee would have found the challenged action materially adverse,

which in this context means it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination.'"  Daniels, 776 F.3d at 195, quoting Burlington N. &

Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (internal quotation marks omitted).  Defendants

concede that "termination is an adverse employment action."  Dkt. No. 32 at ECF p. 27.  Plaintiff

argues that the adverse actions taken against him also included being placed on a PIP on October

11, 2011 and being placed on a second PIP in May 7, 2012.  See Dkt. No. 33 at ECF p. 26.

Viewing the facts in the light most favorable to plaintiff, each of the actions that plaintiff claims

to be adverse "could have dissuaded a reasonable person in her position from charging

---

after he filed his written harassment complaint.  Mallett Dep. at 56:10-13.

discrimination.  Consequently, they satisfy the second prong of [his] prima facie case" of retaliation.  Daniels, 776 F.3d at 196.

With respect to the question of whether plaintiff has shown the requisite causal connection, plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between his protected activity and the adverse action taken against him.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000).  "[T]emporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive."  Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotation and citation omitted).  "In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."  Daniels, 776 F.3d at 196 (citations omitted).

Plaintiff argues that he can establish the requisite causal connection for his prima facie case of retaliation because "[t]here was a clear continual connection of the events at issue here, which would not negate timing.  As soon as he launched his verbal, and subsequent written complaint, he was placed on a PIP."  Dkt. No. 26 at ECF p. 45.  He contends that his complaints "were a determinative factor in [defendants'] decision to terminate."  Id.  Defendants contend that "there is no protected activity that occurred before plaintiff began to receive negative feedback – which according to Plaintiff's own testimony began on [ ] Moleski's first day of employment."  Dkt. No. 32 at ECF p. 24.  They argue that "[p]laintiff cannot establish but-for causation [where] the alleged protected activity occurred[ ] after a process was already started

concerning Plaintiff's unprofessional behavior and performance inadequacies." Id. at ECF p. 26.

On the record before me, I find that the temporal proximity between plaintiff's complaints, both formal and informal, and the alleged retaliatory action is not sufficient on its own to establish a causal link. Plaintiff was placed on a PIP after he filed his formal complaint claiming "racial profiling" and after he claims he made comments to Mallett regarding Moleski's expressions of desire to hire younger employees (viewing the facts in plaintiff's favor, given Mallett's conflicting recollection of the timing of her conversation with plaintiff). However, the wheels were in motion to address plaintiff's perceived performance deficiencies well before plaintiff registered the relevant complaints. As defendants argue, according to plaintiff's own testimony, he began to receive negative performance feedback on Moleski's first day. Dkt. No. 32 at ECF p. 24; see Lewis Dep. at 148:8-16. Moleski complained about plaintiff to Mallett within a month of his arrival at Temple, Mallett Dep. at 33:19-23, and emailed plaintiff about issues with plaintiff's performance on multiple occasions beginning in July 2011. See Dkt. No. 32-1 at ECF p. 62. As Moleski communicated in an email to Schlegel, he had conversations with human resources about putting plaintiff on a corrective action plan by no later than August 17, 2011. Id. at ECF p. 73. Moleski again complained about plaintiff's ordering habits on August 22, 2011. Id. at ECF p. 75. All of this occurred *before* plaintiff made his formal complaint on September 14, 2011 (a complaint which did not make any reference to plaintiff's claimed prior complaints regarding Moleski's comments about hiring younger employees). It was only thereafter on October 10, 2011 that plaintiff was placed on the first PIP. Id. at ECF p. 89-90. Defendants were merely "proceeding along lines previously contemplated" when they imposed the first PIP. Gladysiewski v. Allegheny Energy, 398 F. App'x 721, 724 (3d Cir. 2010) (affirming the District Court's finding that the plaintiff had not shown the requisite causal

connection to establish his retaliation claim); see also Verma v. Univ. of Pa., 533 F. App'x 115, 119 (E.D. Pa. 2013) (finding that a causal link should not be inferred "where an employee's negative performance evaluations predated any protected activity"), citing Shaner, 204 F.3d at 504-05.

Plaintiff also conceded that there were "still . . . things that he need me to work on" at the end of the first PIP.  Lewis Dep. at 240:20-21.  Moleski gave plaintiff a second chance to improve his performance in May 2012, Dkt. No. 32-1 at ECF p. 92, against Mallett's recommendation.  Mallett Dep. at 40:11-41:17.  Only after a failed inspection of plaintiff's work area, Dkt. No. 32-1 at ECF p. 94-97, was he terminated.  Id. at ECF p. 99.

However, faced with a substantial inconsistency between Mallet's testimony and Moleski's testimony with respect to whether Moleski knew about plaintiff's harassment complaint prior to placing plaintiff on the first PIP, I find that I must conclude that material questions of fact remain with respect to whether plaintiff can establish a prima facie case of retaliation.  In their brief in support of their motion for summary judgment, defendants assert that "[d]uring Plaintiff's employment with Temple, Mr. Moleski never learned that Plaintiff made a formal claim of discrimination.  Thus as a matter of law, Plaintiff cannot show a temporal connection between his protected activity and Mr. Moleski's decision to terminate him."  Dkt. No. 32 at ECF p. 28.  Moleski testified that when he made the determination to place plaintiff on the first PIP, the second PIP or when the decision to terminate plaintiff was made he was not aware of plaintiff's formal harassment complaint or plaintiff's complaints that Moleski was making comments about his desire to hire younger employees.  Moleski Dep. at 89:6-13; 90:23-91:3.  It is true that "plaintiff . . . cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of [ ] plaintiff's

protected conduct at the time they acted." Daniels, 776 F.3d at 196 (citations omitted). But that is not the case here. Mallett clearly testified that she met with Moleski and "told him that the complaint was filed and told him what the nature of the complaint was." [5] Mallett Dep. at 64:24-65:2. Viewing Mallet and Moleski's conflicting testimony in plaintiff's favor, I find that a reasonable finder of fact might conclude that a causal link exists between plaintiff's protected activities and the adverse actions. Because a jury might find that the timing of the claimed retaliatory action is "unusually suggestive" of retaliation I find that plaintiff has raised material questions of fact with respect to his prima facie case of retaliation .

## III.   Legitimate Non-Discriminatory Reason

Because I find that plaintiff has set forth a prima facie case of age discrimination and retaliation, the burden shifts to defendants to offer a legitimate, nondiscriminatory reason for the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 596 (1993). To establish that they had a legitimate, nondiscriminatory reason for the adverse actions taken against plaintiff, defendants "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981). This is a "relatively light burden." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Defendants contend that plaintiff's performance deficiencies were a legitimate nondiscriminatory reason for their adverse actions. Defendants' contention is supported by testimony from Moleski and Mallett and Moleski's emails to Lewis and Schlegel. Plaintiff does not argue that defendants have not met their burden to set forth a legitimate nondiscriminatory

---

[5]   Remarkably, defendants brief fails to address or even acknowledge Mallet's contradictory testimony. Nor does defendants' reply brief respond to plaintiff's contention in his counter statement of material and disputed facts that the conflicting testimony of Moleski and Mallet presents "clear inconsistencies on a material issue." Dkt. No. 33-1 at ECF p. 16, ¶ 92.

reason for the adverse actions taken against him.  Moreover, defendants have set forth ample

evidence of a legitimate, non-discriminatory reason for placing plaintiff on both PIPs and his

subsequent termination:  that plaintiff was not performing the duties of his job to a level

acceptable to Moleski.

## IV.    Pretext

Because defendants have offered a legitimate reason for the adverse actions taken against

plaintiff, the burden shifts back to plaintiff, who must provide "some evidence from which a

factfinder could reasonably conclude that [ ] defendant[s'] proffered reasons were fabricated."

Fuentes, 32 F.3d at 764.  Plaintiff can "prevail by either (i) discrediting [defendants'] proffered

reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or

direct, that discrimination was more likely than not a motivating or determinative cause of the

adverse employment action."  Torre v. Casio, Inc., 42 F.3d 825, 829-30 (3d Cir. 1994) (emphasis

in original), citing Fuentes, 32 F.3d at 764.  For the reasons that follow, I find that summary

judgment is warranted because plaintiff has not set forth sufficient evidence to rebut defendants'

legitimate non-discriminatory reason for his being placed on PIPs or for his termination.[6]

First, to discredit an employer's proffered reason, a plaintiff "cannot simply show that the

employer's decision was wrong or mistaken" or simply offer "his own opinion that [defendants]

treated him wrongfully, unprofessionally, and unfairly."  Igwe v. E.I. Dupont De Nemours &

Co., 180 F. App'x 353, 356 (3d Cir. 2006).  Accordingly, in Cridland v. Kmart Corp., 929 F.

Supp. 2d 377, 387-88 (E.D. Pa. 2013), the Court found that the plaintiff had not presented

evidence that could cause a reasonable factfinder to disbelieve the defendant's articulated

---

[6]      For the same reasons, even if I could find on the basis of the evidence now before
me that plaintiff could establish a prima facie case that he has been discriminated against because
of his race, he has not set forth sufficient evidence to withstand defendants' summary judgment
motion.

legitimate reason for his termination  where the "[p]laintiff submitted no evidence refuting the[ ] core facts of [the defendant's] dissatisfaction – no evidence that Plaintiff received positive reviews, no evidence that he was showing signs of consistent improvement, and no evidence that he was managing his store according to the company's expectations."  Id. at 387-88.  "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."  Fuentes, 32 F.3d at 765.  "Based on the evidence submitted thus far, a reasonable factfinder would have no legitimate basis for disbelieving [defendants'] nondiscriminatory explanation" for placing plaintiff on the PIPs or for plaintiff's termination.  Cridland, 929 F. Supp. 2d at 388.

        In support of his claim that he can demonstrate pretext, plaintiff claims that "there was a tremendous amount of fabrication within the disciplinary/performance documents administered to him as they outright contained false information[.]"  Dkt. No. 33-1 at ¶ 54.  Plaintiff, however, presents no concrete evidence to from which a reasonable factfinder could conclude that the relevant documents were premised on fabrications.  Instead, in his opposition to defendants' motion, plaintiff sets forth four and a half pages of examples of conduct which he contends demonstrate that his "purported performance deficiencies . . . are incredible on their fac[e]."  Dkt. No. 33 at ECF p. 27-33.  With limited exceptions, however, each of the examples is supported only by plaintiff's own testimony.  See, e.g., id. at ECF p. 31 ("Lewis was consistently under budget each fiscal year with food purchases." (emphasis in original); "Lewis always exhibited a positive attitude towards Moleski."); id. at ECF p. 32 ("As Lewis articulated during his deposition – anything Moleski asked of him, he did . . . ."; "Lewis viewed t[he mock safety sanitation inspection of his work area] as a 'one-sided' inspection . . . .").  "Aside from being entirely self-serving and derived almost exclusively from his own testimony, Plaintiff's evidence

does not tend to discredit the reasons that [defendants have] given for his termination." Roy v. Continuing Care RX, Inc., No. 08-2015, 2010 WL 5862864, at *9 (M.D. Pa. Oct. 7, 2010) report and recommendation adopted, 2011 WL 721487 (M.D. Pa. Feb. 22, 2011). Without some other evidence calling into question the veracity of defendants' evaluation of plaintiff's work, plaintiff's own testimony is insufficient to contradict defendants' conclusion that plaintiff had "not maintained an acceptable level of performance evidenced by continued issues with sanitation, purchasing and inventory," Dkt. No. 32-1 at ECF p. 99, a conclusion which led to his termination. See Solomon v. Soc'y of Auto Eng'rs, 41 F. App'x 585, 586 (3d Cir. 2002) (finding that summary judgment was warranted in favor of the defendant where "the only evidence in support of [the plaintiff's] claims was [his] own testimony"); Fusco v. Bucks Cnty. of Pa., No. 08-2082, 2009 WL 4911938, at *11 (E.D. Pa. Dec. 18, 2009) ("The Plaintiff offers no support, beyond her own testimony, to corroborate her claims."); Hancox v. Lockheed Martin Tech. Servs., No. 04-6104, 2007 WL 1796248, at *8 (D.N.J. June 21, 2007) (finding "no reasonable jury could find [the defendant's proffered reason is pretextual" where the plaintiff did "not support her claim with any admissible evidence other than her own testimony (that consists mainly of her opinion and conjecture regarding [the defendant's] motives for terminating her)"). Plaintiff has not set forth any evidence to show that defendants' reasons for the adverse actions "are so weak, incoherent, implausible, or inconsistent that they lack credibility." Fuentes, 32 F.3d at 765. He has not discredited defendants' proffered reasons for his termination.

Nor has plaintiff set forth evidence from which a reasonable factfinder could conclude that "an invidious reason was more likely than not a . . . determinative cause of [defendants'] action." Fuentes, 32 F.3d at 764. To meet this burden, "a plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to 'unlawful discriminatory treatment,'

that it had 'treated other, similarly situated persons not of his protected class more favorably, or that it had 'discriminated against other members of his protected class or other protected categories of persons.'" Anderson v. Wachovia Mtge. Corp., 621 F.3d 261, 277 (3d Cir. 2010), quoting Fuentes, 32 F.2d at 765.

With respect to plaintiff's age discrimination claim, Porter's testimony that that "once a week" Moleski would say "that he thought that [younger employees] would give a fresher insight and just that they would boost new – I don't want to say energy, but just that they would have a different way of looking at things." Porter Dep. at 27:17-28:2, is relevant to the question of whether an invidious discriminatory reason was more likely than not the reason behind plaintiffs' termination. So is plaintiff's testimony that" every conversation, just about every opportunity we have in conversation, [Moleski was] constantly expressing his desire to obtain young college kids." Lewis Dep. at 180:19-181:2. However, without more, Moleski's comments cannot support a finding that an invidious reason was more likely than not a determinative cause of plaintiff's termination. "When considering whether remarks are probative of discrimination, we consider the speaker's position in the organization, the content and purpose of the statement, and the 'temporal connection between the statement and the challenged employment action.'" Hodczak v. Latrobe Specialty Steel Co., 451 F. App'x 238, 241 (3d Cir. 2011), quoting Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997). Neither plaintiff nor Porter provided context in their testimony that would tie Moleski's alleged comments about having a preference to hire younger workers to Moleski's interactions with plaintiff, to his assessment of plaintiff's performance or to the decision to terminate plaintiff.[7] "Under Third Circuit precedent,

---

[7]     Plaintiff's failure to include allegations of age discrimination in his formal harassment complaint despite his claim that Moleski was "constantly" making comments about his preference arguably undercuts plaintiff's contention that age discrimination was a

'stray remarks' unconnected from an adverse employment decision are insufficient to show invidious purpose." Cridland, 929 F. Supp. 2d at 389, citing Hodczak, 451 F. App'x at 241 ("Here, although several of the statements were made by LSS executives, they were temporally remote from the decision to discharge Appellants, and completely unrelated to the investigation regarding Appellants' violation of the EC Policy. Thus, the comments qualify as 'stray remarks' and are entitled to minimal weight."); Ezold, 983 F.2d at 545 ("Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."). Contra Armbruster v. Unisys Corp., 32 F.3d 768 (3d Cir. 1994) (finding questions of fact remained with respect to pretext where the plaintiffs set forth evidence including age-related comments of personnel immediately involved in events leading up to the plaintiffs' terminations and specific documents containing age notations concerning those events).

To the extent that plaintiff contends that Moleski acted with an invidious purpose because he knew of plaintiff's discrimination complaint when plaintiff was placed on the first PIP, I find that the record does not support such a finding. There is clear evidence that the wheels were in motion to place plaintiff on the first PIP well before he registered his harassment complaint. See Dkt. No. 32-1 at ECF p. 73 (August 17, 2011 email from Moleski to Schlegel explaining that Moleski had discussed plaintiff's "inappropriate behavior with HR" and that they "would be developing a corrective action plan to address this conduct and other performance issues"). Defendants' concerns with plaintiff's job performance are well documented and plaintiff has not set forth sufficient evidence to prove that they were false. Nor has plaintiff set forth any

---

determinative cause of his termination. Indeed, if Moleski had a preference for hiring "young college kids," his preference was not realized when plaintiff was temporarily replaced by Wyatt, age 49 or when Temple hired Klova, age 53. Dkt. No. 33-4 at ECF p. 8.

evidence to suggest that his discrimination complaints either formal or informal had any effect on defendants' decisions regarding how to address plaintiffs' perceived performance inadequacies (e.g., evidence that plaintiff's complaints caused defendants to implement the PIPs more quickly or that defendants gave plaintiff less time to bring his performance up to standards following his complaints).  Ultimately, "[t]he question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [retaliation]."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (quotations omitted).  On the record before me, I find that there is not sufficient evidence to permit a jury to find that retaliation was more likely not a motivating or determinative cause of defendants' decisions to place him on the PIPs and, subsequently, to terminate him.

I find that plaintiff has not met his burden on summary judgment to show that an invidious reason was more likely than not the reason for his being placed on PIPs or for his termination.  Plaintiff thus has not rebutted defendants' legitimate nondiscriminatory reason for the claimed adverse actions and I will grant defendants' motion for summary judgment with respect to plaintiff's age discrimination and retaliation claims.

An appropriate Order follows.